Filed 1/13/14  In re Emily B. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re EMILY B., a Person Coming Under the Juvenile Court Law. | B248678<br>(Los Angeles County<br>Super. Ct. No. CK50260) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTINA B.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra Losnik, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Navid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

Christina B. (mother) appeals the juvenile court's jurisdictional findings regarding her 14-year-old daughter, Emily, as well as the court's decision to terminate jurisdiction after awarding custody of Emily to her father, William M. (father).  Finding no error, we affirm.

FACTS AND PROCEDURAL HISTORY[1]

In 2002, the Department of Children and Family Services (DCFS) filed, and the juvenile court sustained, a Welfare & Institutions[2] Code section 300 petition on behalf of Emily and her older half-brother Sam, alleging that mother's substance abuse periodically rendered her unable to care for her children.  The children were suitably placed, mother received reunification services, and the juvenile court ultimately terminated jurisdiction with a Family Law Order awarding mother sole legal and physical custody of both children.

On December 19, 2012, DCFS received a referral that mother and Sam, now an adult, were using drugs in the home.  The referral further alleged that there was "heavy traffic" of people in and out of the family home, and that Sam had recently burned Emily's arm with a cigarette.  On December 21, DCFS interviewed mother, who denied abusing illegal drugs and claimed to have been sober for nearly seven years.  Mother said she knew that Sam was abusing drugs in the home, and had asked him to move out.  Mother also stated that the multiple-unit complex in which the family lived was illegally built, the electricity to the home had been shut off for safety reasons, and the bank had recently "seized" the property.  The bank was reportedly in the process of demolishing the complex, but the family did not know when they would be asked to leave the property.  The social worker observed that the home looked as if it were under

_____

[1] In accordance with the usual rules on appeal, we state the facts in the light most favorable to the dependency court's order.  (*In re Tania S.* (1992) 5 Cal.App.4th 728, 733.)

[2] All subsequent section references are to this code.

construction, with a hole in the ceiling and no electricity.  Mother agreed to provide a drug test.  She also indicated she had sole custody of Emily, but she allowed Emily's father to have supervised visits.

On January 8, 2013, DCFS interviewed father, who indicated he had a history of substance abuse but had been sober for seven years.  Father reported that mother routinely stays up all night and that people come and go from the home during odd hours, behavior he associates with drug use.  Father agreed to submit to a drug test.

On January 9, 2013, DCFS asked mother to submit to an on-demand drug test, which she agreed to do.  A week later, when DCFS contacted the testing center to request the drug test results, the staff member stated there was no record of mother submitting a test.  When questioned, however, mother produced a receipt showing she had drug tested on January 9.  DCFS received the results of that test on January 23, which indicated mother had tested positive for methamphetamine.  Mother could not account for the positive result.  She later informed DCFS that she had consulted with an attorney who advised her to not submit to any further drug tests until she was able to alter her diet and cleanse her system, so that whatever resulted in the "false positive" was no longer in her body.  Mother refused multiple requests for additional drug testing.  She offered to provide a blood or hair sample; the social worker explained that DCFs could only request urine tests.  Mother refused to provide another urine sample until her attorney advised her otherwise.

The social worker then offered to come to the home and speak with mother and Emily together in order to create a safety plan.  Mother stated she first would have to speak with her attorney before allowing the social worker to enter her home or speak with Emily.

On February 1, 2013, DCFS obtained a warrant for Emily's removal.  The social worker attempted to contact mother, explaining that DCFS wanted to work with mother to provide support to meet the family's needs, and left messages for a return call.  Mother did not respond.  On February 7, 2013, DCFS executed the warrant and detained Emily from mother's custody.

DCFS learned that, while father was not a fixture of Emily's early childhood, the two had established a "comfortable" relationship prior to the current investigation. Father had secured medical insurance for Emily and completed paperwork to provide mother with child support payments. He participated in a Team Decision Meeting and agreed to act in a protective manner while caring for Emily. Father's drug test results were negative. Based on this information, Emily was released to father's custody.

On February 13, 2013, DCFS filed a section 300 petition on Emily's behalf, based on mother's history of substance abuse and her current methamphetamine use. At the detention hearing on that date, the juvenile court found father to be Emily's presumed father. The court also found a prima facie case for detaining Emily as a minor described by section 300, subdivision (b). Emily was released to father's custody. The court ordered monitored visits for mother.

DCFS interviewed mother, father, and Emily in preparation for the March 21, 2013 jurisdiction/disposition hearing. Mother offered her intimate relations with her methamphetamine-using boyfriend as an explanation for her positive drug test. She again denied being a current user of the drug, and indicated that she had not complied with the drug testing requirements because she was ill. Mother also refused access to her home, explaining the building was being demolished. DCFS observed a portion of a monitored visit between mother and child. The social worker noted that the two appeared to have a close relationship, interacting comfortably with one another.

Father reported that Emily had found drugs and drug paraphernalia in the home while Sam was living there, and had flushed the drugs down the toilet. She also told father that mother would stay up all night, and that people would come and go from the house at odd hours. Emily reported to father than mother did not speak to her for three days after she had been detained, and that when they finally did speak, mother blamed Emily for DCFS's involvement, which was very upsetting to her. DCFS noted that father was committed to providing Emily with a nurturing and safe environment.

In her interview with DCFS, Emily denied that she had ever seen her mother use drugs in the home. She felt safe in mother's custody, and thought that it was "stupid"

4

that her visits with her mother were monitored. Emily stated that in 2011, she lived with father for a period of eight or nine months. She could give no specific reason for this arrangement, and said it made no difference to her which parent she lived with. She wanted both mother and father to have equal custody of her.

Based on the foregoing, DCFS concluded that Emily's safety could not be assured in mother's custody. At the jurisdiction and disposition hearing, it recommended that the juvenile court declare Emily a dependent of the court, and release her to her father's custody. DCFS recommended the court provide father with family maintenance services and mother with family reunification services.

Mother's counsel argued the petition should be dismissed. Mother disputed the drug test results, claiming an issue with the chain of custody because the lab initially had no record of mother having submitted to the drug test. She also maintained that Emily was well cared for, and there was no nexus between mother's alleged drug use and any risk to Emily.

The juvenile court found Emily to be a minor described by section 300, subdivision (b), as alleged in the petition.

As to disposition, father noted that he was non-offending, and asked that the juvenile court terminate jurisdiction with an order granting him custody. Mother asked that Emily be returned to her custody. Emily's counsel noted that Emily was mature and intelligent; she advocated no particular disposition.

The juvenile court declared Emily a dependent of the court, ordered her placed in father's custody and, over DCFS's objection, terminated jurisdiction. The court ordered monitored visits for mother. Emily was very upset that her visits with her mother would be monitored.

Mother timely filed a notice of appeal. She maintains there was no substantial evidence to support either the jurisdictional or dispositional findings and orders.

DISCUSSION

1. *The jurisdictional findings and orders*

Mother challenges the finding that Emily was at risk of physical harm as a result of mother's substance abuse. She argues that Emily "had not been harmed in mother's care and there was insufficient evidence to prove she would be at substantial risk of harm in the future."

We begin with the relevant law. Section 300, subdivision (b) provides that a child may be declared a dependent of the court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b).)

"'When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.] In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason. [Citation.]' (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)

Here, there was sufficient evidence to support the juvenile court's jurisdictional finding over Emily. Mother had a history of substance abuse dating back to 1989, when she was arrested for possession of a controlled substance. In 2003, her children were declared dependents of the juvenile court based on her substance abuse, and she had received services to address her substance abuse issues from 2002 until 2003 and again from 2007 until 2010. Mother tested positive for methamphetamine in January 2013, and

6

although she disputed the accuracy of that test, she refused all further DCFS requests to drug test. She admitted that her boyfriend used methamphetamine, and was aware that her son was using drugs in her home yet permitted him to visit. She resided with Emily in an apartment exposed to the elements, lacking electricity, and subject to demolition due to is uninhabitability, and tolerated a parade of visitors coming and going in and out of the home at all hours of the day and night. This situation is completely inconsistent with the Legislature's conclusion that a home environment free from the negative effects of substance abuse is the minimum condition necessary for the safety, protection and physical and emotional well-being of a child. (§ 300.2.)

Mother nevertheless argues that jurisdiction over Emily was improperly asserted because there was insufficient evidence that the child was harmed in mother's care or that she was at substantial risk of serious harm in the future. Mother relies on *In re Destiny S.* (2012) 210 Cal.App.4th 999 and *In re Drake M.* (2012) 211 Cal.App.4th 754, to argue that a parent's drug use, without more, is not a sufficient basis on which to ground dependency jurisdiction. As the latter case notes, "Although a finding of substance abuse is necessary under this prong of section 300, subdivision (b), it does not always follow that such a finding means that the parent or guardian at issue is unable to provide regular care resulting in a substantial risk of physical harm to the child. The trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case." (*Id*. at p. 766.) It went on to explain that in that case, "At the time of the hearing, Drake was only 14 months old. DCFS needed only to produce sufficient evidence that father *was* a substance abuser in order for dependency jurisdiction to be properly found. DCFS failed to do so." (*Id.* at p. 767.)

In the instant case, there was ample evidence that Emily was in fact not well cared for in mother's home. She had access to drugs and drug paraphernalia, which were left where she could find them and use them. Mother was up all night and allowed various people to come into the home at odd hours. The home itself was problematic because it had been illegally built, was periodically without electricity, had a hole in the ceiling, and was scheduled to be demolished. Mother rebuffed DCSF's efforts to examine the home

7

for safety issues or to speak to Emily. She did not attend the Team Decision Meeting and refused the social worker's offer to create a safety plan for Emily's well-being. All of these facts, coupled with mother's history of drug use, provided ample evidence for the juvenile court to find that Emily was a person described by section 300, subdivision (b).

Additionally, the fact that Emily had not already been harmed in mother's care is not a persuasive argument against the juvenile court's assumption of jurisdiction. The purpose of dependency proceedings is to prevent risk, not ignore it. (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1004.) "The idea that state authority can be mobilized only after the fact is untenable . . . . The state, having substantial interests in preventing the consequences caused by a perceived danger, is not helpless to act until that danger had matured into certainty. Reasonable apprehension stands as an accepted basis for the exercise of state power." (*Id.* at p. 1003.)

In sum, the juvenile court's jurisdictional findings and orders are supported by substantial evidence.


2. *The dispositional findings and orders*

Mother also contests the juvenile court's dispositional orders. Specifically, mother contends that the return of Emily to mother's care would not put her at risk of physical harm, and thus the order awarding custody to father violated section 361, subdivision (c)(1). She further argues that the court erred in terminating jurisdiction, as the order deprived her of the opportunity to reunify with her child.

At a disposition hearing, the court may order a child removed from the physical custody of a parent or guardian if it finds that there is a substantial danger to the health, safety, protection, or physical or emotional well-being of the child if the child were returned home, and there are no reasonable means to protect the child without removing the child from the parents' or guardians' physical custody. (§ 361, subd. (c)(l).) A removal order is reviewed for substantial evidence. (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.)

8

Section 361.2, subdivision (b)(1), states that if the juvenile court places a child with a parent with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of section 300, the court can terminate jurisdiction over the child. (§ 361.2, subd. (b)(l).) In considering that option, the juvenile court's primary focus is the best interests of the child. (*In re John W.* (1996) 41 Cal.App.4th 961, 965.) An order terminating jurisdiction with a Family Law exit order is reviewed for an abuse of discretion, and will not be disturbed on appeal unless the juvenile court exceeded the bounds of reasons. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

Here, the evidence which supported the jurisdiction order also supports the juvenile court's decision not to return Emily to mother's care. Clearly, the court concluded that mother was using methamphetamines: She consorted with methamphetamine users, tested positive for the drug, refused to submit to retesting, and posited multiple explanations both for the "false positive" test results and for avoiding further testing. The future risk of harm to Emily might be reduced if mother were addressing her methamphetamine addiction and the deleterious effects it was having on her daughter. However, mother refused to permit DCFS to speak with Emily and to evaluate the home, and declined DCFS's invitation to work together to ensure Emily's health and safety. In short, mother's inability to recognize that the home environment she had created was harmful to Emily exacerbated the risk of future harm to an unacceptable level.

Substantial evidence also supports the court's decision to terminate jurisdiction after awarding custody to father. That decision was based on the court's conclusion that there was no continuing need for the supervision of the court, a finding necessary for such continued jurisdiction when custody is awarded to a previously non-custodial parent. (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1449.) Indeed, mother points to no evidence which would support the conclusion that continued court supervision was necessary to ensure Emily's health, safety or welfare. Because the juvenile court's

9

decision to terminate jurisdiction was not "arbitrary, capricious, or patently absurd" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318), we must affirm it.

DISPOSITION

For the reasons set forth above, the juvenile court's jurisdictional findings and the order terminating the court's jurisdiction are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MINK, J.[*]

We concur:

MOSK, Acting P. J.

KRIEGLER, J.

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.